**STATE of Minnesota, Respondent,**

v.

**Paul Allen ENGER, Jr., Appellant.**

No. C5–95–63.

Court of Appeals of Minnesota.

Oct. 31, 1995.

Review Denied Dec. 20, 1995.

Hubert H. Humphrey, III, Attorney General, Cheryl W. Heilman, Asst. Attorney General, St. Paul, Douglas L. Ruth, Steele County Attorney, Owatonna, for Respondent.

Steven P. Russett, Leslie Rosenberg, Asst. Public Defenders, St. Paul, for Appellant.

Considered and decided by WILLIS, P.J., and HUSPENI and THOREEN,* JJ.

## OPINION

HUSPENI, Judge.

Appellant claims the trial court abused its discretion in failing to grant a new trial or judgment of acquittal, arguing: (1) there was insufficient evidence for his conviction of criminal sexual conduct in the first degree; (2) the trial court abused its discretion by providing the parties with only a portion of B.B.'s diary; (3) the trial court abused its discretion by admitting *Spreigl* evidence of a prior bad act by appellant; and (4) the trial court erred in sentencing. Because we conclude that appellant's sufficiency and evidentiary arguments are without merit, we affirm on those issues; with regard to appellant's sentence, because we conclude that the conditional release period must be reduced by the supervised release period, we modify those periods to a total of 60 months.

## FACTS

Appellant Paul Allen Enger met B.B., a 27–year–old mentally retarded and learning disabled woman, in 1988. In April 1991, they began a sexual relationship. Later that month, B.B. sought a restraining order against appellant as a result of an incident in which appellant refused to leave B.B.'s apartment upon her request, became verbally abusive, and grabbed the phone receiver from B.B.'s hands and shook it in her face.

In November 1991, appellant threatened to "press charges" against B.B. unless she published an apology in the local newspaper and petitioned to dismiss the restraining order.

---

* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 10.

B.B. complied with appellant's request and the sexual relationship resumed.

When appellant arrived to visit B.B., he usually threw stones at her window to get her attention. In August 1992 neighbors complained about this behavior and B.B.'s apartment manager informed B.B. that in order to avoid eviction, B.B. would have to get a restraining order against appellant. B.B. filled out the papers for a restraining order but never pursued the matter in court.

According to B.B., in April 1993, after she and appellant had sex, appellant asked her for $10 to pay for his ride to her apartment and when she told him she had no money, he took two pennies from her purse, said "thank you for paying me for my services," and left. B.B. wrote appellant a letter with a penny attached to it, stating in part "I got what you were trying to say to me. Thank you for your services but I don't need your kind of services any more."

In early June 1993, appellant invited B.B. to watch him play in a baseball game and while at the game he told B.B. that he did not want to see her any more.

On June 14, 1993, appellant came to B.B.'s apartment at her request. B.B. gave appellant a letter stating that she would never take him back. Appellant was unwilling to accept B.B.'s declaration and tried to kiss her. She turned her head away, told him "don't," and ran into her bedroom and tried to lock the door. Appellant followed her, forced the bedroom door open, grabbed her, pulled her shorts down, and pushed her onto the bed. According to B.B.'s testimony, appellant stated that he was going to get back $700 that he had to pay an attorney to get the restraining order dropped. Appellant then began hitting B.B.'s legs to force them open. B.B. testified that she kept telling him "no." Appellant grabbed and tore B.B.'s underwear, as she tried to hold onto it, penetrated her with his penis, and ejaculated on her stomach. When B.B. refused appellant's request to wash herself, appellant himself washed B.B.'s stomach and left the apartment.

B.B. did not have a telephone in her apartment. She testified that because she saw appellant driving around her building, she did not go outside immediately to call for help from a pay telephone. When she was sure appellant had left, she went outside and called police, who took B.B. to the hospital. The examining physician testified that she had two large bruises on her inner thighs, two symmetrical bruises on her upper arms, and a bruise over a prominent bone on her left hip.

At trial, appellant admitted he went to B.B.'s apartment the night of June 14, 1993, read the letter, and had sex with her. He denied hitting her, denied that B.B. ever said "no," and denied noticing any bruises either before or after they had sex.

At the omnibus hearing, appellant requested a copy of B.B.'s diary to use as evidence that B.B. fabricated the crime. The trial court, over prosecutorial objection, ordered that the diary be returned to the police and made available to appellant. Pursuant to a motion for reconsideration, the trial court conducted an in camera review of the diary and provided the parties with only a portion of the original diary.

After a trial, the jury acquitted appellant of violating Minn.Stat. § 609.342, subd. 1(c) (fear of imminent great bodily harm) but convicted him of violating Minn.Stat. § 609.342, subd. 1(e)(i) (force or coercion). The trial court denied motions for a new trial and judgment of acquittal and imposed sentences of 57 months imprisonment, 29 months supervised release, and up to five years conditional release following the supervised release period.

## ISSUES

1. Was the evidence sufficient to support the verdict finding appellant guilty of first-degree criminal sexual conduct?

2. Did the trial court abuse its discretion in performing an in camera review of B.B.'s diary and in limiting the evidence presented at trial to that pertaining to B.B.'s prior relationship with appellant?

3. Did the trial court abuse its discretion in allowing the prosecution to introduce, without a formal *Spreigl* notice, evidence of a prior incident between appellant and B.B.?

4. Did the trial court err in sentencing appellant to five years conditional release following 29 months supervised release?

## ANALYSIS

### 1. Sufficiency of the evidence.

In reviewing a claim of insufficiency of the evidence, this court's review

is limited to a painstaking analysis of the record to determine whether the evidence, when viewed in a light most favorable to the conviction, was sufficient to permit the jurors to reach the verdict which they did.

*State v. Webb,* 440 N.W.2d 426, 430 (Minn. 1989).

■ A reviewing court must also assume that "the jury believed the state's witnesses and disbelieved any evidence to the contrary." *State v. Moore,* 438 N.W.2d 101, 108 (Minn.1989). Moreover, a complainant's testimony need not be corroborated in a prosecution for criminal sexual conduct. Minn.Stat. § 609.347, subd. 1 (1992). *See State v. Halvorson,* 506 N.W.2d 331, 335–36 (Minn.App.1993) (holding testimony of a 19–year–old victim of criminal sexual conduct was sufficient for the jury to believe her story over that of the defendant); *State v. Haala,* 415 N.W.2d 69 (Minn.App.1987) (holding ten-year-old's unequivocal testimony about her father touching her was sufficient to convict him for second degree criminal sexual conduct despite his claim that the story was fabricated), *review denied* (Minn. Dec. 22, 1987).

■ Appellant argues that the state's evidence was insufficient to support his conviction because the state failed to prove that appellant used force or coercion to have sexual intercourse with B.B. We disagree. Appellant admitted that he had sexual intercourse with B.B. at her apartment on June 14, 1993. The jury had the opportunity to consider B.B.'s testimony, to judge her demeanor, and to weigh the credibility of her story against appellant's version of events. In addition, the jury heard expert testimony that B.B.'s bruises were consistent with her allegations of criminal sexual conduct. The trial testimony provides a sufficient basis from which the jury reasonably could have returned a guilty verdict.

### 2. B.B.'s diary.

■ Appellant argues that the trial court, by reviewing the diary in camera and then making only a portion of the diary available to the parties, precluded appellant's discovery and use of all relevant material to support his theory that B.B. fabricated the crime. We disagree.

■ "Appellate courts largely defer to the trial court's exercise of discretion in evidentiary matters and will not lightly overturn a trial court's evidentiary ruling." *State v. Kelly,* 435 N.W.2d 807, 813 (Minn.1989). "A ruling is prejudicial and therefore reversible if there is a reasonable possibility the error complained of may have contributed to the conviction." *Id.*

The Minnesota Supreme Court has held in camera [review] strikes a fairer balance between the interest of the privilege holder in having his confidence kept and the interest of the criminal defendant in obtaining all relevant evidence that might help in his defense. We believe that *trial courts, who by training and experience are qualified for the task of determining matters of relevancy, are capable of determining what if any of the information in the records might help in the defense.*

*State v. Paradee,* 403 N.W.2d 640, 642 (Minn. 1987) (emphasis added). A trial court's determination that the records are not helpful to the defense is "subject ultimately to judicial review." *Id.*

This court has independently reviewed the entire diary, and we conclude that the trial court did not abuse its discretion in denying defense counsel access to the complete diary. The trial court properly determined that the contested material failed to disclose information relevant to the fairness of the trial. *See id.* at 641.

■ We further conclude that the protection of the rape shield law is available to B.B. *See* Minn.R.Evid. 412(1)(A)(i); *see also* Minn.Stat. § 609.347, subd. 3(a)(i) (1992). While the rape shield law may permit evidence of a victim's prior sexual conduct to

establish a common plan or scheme when consent is in issue, there is no evidence in this case that B.B. had ever previously fabricated sexual assault charges. Therefore, there could be no relevant evidence tending to establish a common plan or scheme.

█ We also conclude admission of B.B.'s sexual history was not constitutionally required. We recognize that case law cautions that exclusion of evidence that the victim is predisposed to fabricate a charge of rape, where the potential for unfair prejudice does not substantially outweigh the probative value of the evidence, risks violating the defendant's rights to due process, to confrontation, and to present evidence in his defense. *State v. Caswell,* 320 N.W.2d 417, 419 (Minn.1982). The record in this case, however, does not demonstrate that there was any relevant evidence tending to establish common plan or scheme.

### 3. Admission of alleged *"Spreigl"* evidence.

█ Appellant argues that the trial court abused its discretion by admitting without formal notice *Spreigl* evidence that appellant took money from B.B.'s wallet without her permission and said that it was payment for his services. We disagree because admission of evidence to establish a relationship between a defendant and a victim is not subject to the *Spreigl* notice requirement. *State v. Black,* 291 N.W.2d 208, 215 (Minn.1980).

Even if we were to consider this challenged evidence to be *Spreigl* evidence, appellant knew that his relationship with B.B. would be an issue at trial and cannot argue that he was unprepared to refute evidence of that relationship. *See State v. Doughman,* 384 N.W.2d 450, 456 (Minn.1986). The trial court did not abuse its discretion in admitting this evidence.

### 4. Sentence.

█ At sentencing, the trial court added that "following the supervised release period,

there be a period of conditional release of up to five years * * *." Appellant argues that the trial court had no authority to sentence him to five years conditional release in addition to the 29 months supervised release. A review of statutory enactments will aid our resolution of the issue appellant raises.

Minn.Stat. § 609.346, subd. 5(a) (1992), provides in relevant part:

> The court shall sentence a person convicted for a violation of section 609.342 * * * to serve a supervised release term of not less than five years.

Because appellant committed the offense on June 14, 1993, the 1992 statute is applicable unless the 1993 statute is merely a clarification of the 1992 version. *See Holman v. All Nation Ins. Co.,* 288 N.W.2d 244, 251 (Minn.1980) (holding that a clarifying act may be read into statutory law retrospectively). Further, the trial court's use of the phrase "conditional release" indicates that the trial court was relying on the 1993 version of Minn.Stat. § 609.346, subd. 5(a). The statute effective August 1, 1993, provides in relevant part:

> [W]hen a court sentences a person to prison for a violation of 609.342 * * * the court shall provide that after the person has completed the sentence imposed, the commissioner of corrections shall place the person on conditional release. If the person was convicted for a violation of section 609.342 * * *, *the person shall be placed on conditional release for five years, minus the time the person served on supervised release.*

Minn.Stat. § 609.346, subd. 5(a) (Supp.1993) (emphasis added).

According to the minutes of the House Judiciary Committee meeting, the statute was amended so "[t]hat the sentence, when it was pronounced, would be clear to the offender." *Hearing on H.F. No. 975 Before the House Committee on Transportation* (March 19, 1993).[1] In order to harmonize

---

1. The minutes further provide:
   As written, this period of five or ten years would begin after the guidelines sentence had expired. * * * [T]hat language in the bill was inadvertent. The committee is recommending

that this five year or ten year conditional release period begin at the end of the term of imprisonment minus any disciplinary confinement time. In other words, it would begin when the individual is released from prison.

the two versions of the statute, we conclude that the 1992 statute's use of the term "supervised release" encompassed both the concept of supervised release and that of conditional release as those terms are used in the 1993 statute. Thus, in the 1993 statute "supervised release" refers to the one-third of the term appellant must still serve after release from prison; "conditional release" refers to the five years imposed by statute.

We conclude that the 1993 statute was a clarification of the 1992 statute to the extent that the later version explained the terms "supervised" and "conditional release." Therefore, arguably the 1993 statute is subject to retroactive application. *See Holman*, 288 N.W.2d at 251. We recognize, however, that the 1993 statute eliminates the trial court's discretion to sentence appellant to more than five years combined supervised and conditional release because it excludes the language in the 1992 statute directing that the defendant "serve a supervised release term of not less than five years." *See* Minn.Stat. § 609.346, subd. 5(a). To the extent the discretion of the trial court is narrowed in the 1993 statute, that statute cannot be considered a clarification.

We conclude our analysis of these statutory provisions with two observations. First, there seems to be an intent on the part of the trial court to sentence according to the terms of the 1993 statute. Second, application of the 1993 statute enures to the benefit of appellant and he may be deemed to have waived his right not to have ex post facto application of a statute in this case. *See In re Welfare of B.C.G.*, 537 N.W.2d 489 (Minn. App.1995) (holding that defendant knowingly and voluntarily waived his constitutional protection against ex post facto application of the law). Therefore, we shall look to the 1993 statute in resolving the sentencing issue.

Our construction of the statute leads us to agree in part and to disagree in part with appellant's argument regarding periods of supervised and conditional release. Appel-

lant wishes to serve only a total of 29 months conditional release. The trial court imposed a total period of 89 months, making the conditional release period consecutive to the supervised release period. Pursuant to our interpretation of the language of the 1993 statute, the five year conditional release period must be reduced by the 29 months supervised release period. Thus we reduce the 89 month period of supervised and conditional release to a total of 60 months (29 months supervised plus 31 months conditional).

## DECISION

There was sufficient evidence to convict. The trial court did not abuse its discretion regarding evidentiary matters. We modify appellant's sentence so that upon release from prison, appellant must serve 29 months supervised release and 31 months conditional release.

**Affirmed as modified.**

---

So that period, let's say a third of the sentence, of the executed sentence of supervised release, would be run concurrently with the five or ten year period of conditional release.

